## Industrial Valley Bank & Trust Company v. Cheltenham Township

*John A. Friedrich*, for appellant.
*Samuel H. High, Jr.*, for respondent.

FORREST, P. J., April 4, 1963.—This is an appeal from the disapproval by the Commissioners of Cheltenham Township, of a plan for the subdivision of certain row houses, into separate ownership. Hitherto, these houses always have been in common ownership. The commissioners, at their meeting held on November 20,

1962, disapproved the plan, and this appeal followed. Appellant contends that the decision of the commissioners was arbitrary, capricious and unjust.

The court held a hearing de novo from which the court makes the following

### Findings of Fact

1. Appellant, Industrial Valley Bank and Trust Company, is a cotrustee of the Estate of Forrest H. Roberts, deceased. The other cotrustee is M. Paul Smith, Esquire.

2. Said cotrustees, as such, are owners of certain premises, upon which there is a row of five houses, known as 103, 105, 107, 109 and 111 Railroad Avenue, Glenside, Cheltenham Township. House no. 103 is connected by party wall with a building which ends the row and which we shall designate as 101 Railroad Avenue. Premises 101 Railroad Avenue contains offices of a real estate and insurance firm.

3. The aforementioned buildings are on lots of approximately 18.40 feet frontage, except lot no. 111 (the end lot) which is 28.43 feet wide. The lots have depths varying from 68.41 to 77.08 feet.

4. The houses and office building are connected by party walls.

5. The buildings were constructed approximately 60 years or more ago, which was many years prior to the enactment of any zoning ordinance in Cheltenham Township.

6. Each of the five houses has a separate entrance and a separate heating, water, electrical and sewage plant. Each house is, and always has been, rented as a separate unit. The landlord has never provided janitorial service for these houses.

7. The trustees desire to sell and convey each of the five houses to the present tenant of same.

8. The party walls of the houses are of brick construction from the ground to the ceiling of the second floor. The party walls from the ceiling of the second floor to the sloping roof above said floor, are of wood frame construction.

9. The cost of extending the fireproof walls from the second floor to the roof would be approximately $1,500 per dwelling, or $7,500 in all.

10. These houses are in "F" Commercial zone, which, according to the zoning ordinance, requires:

(a) A front yard of a depth of at least 10 feet (irrespective of when the building was erected); (section 905);

(b) "Every building hereafter erected, altered or used wholly as a dwelling shall have at least one side yard which shall be at least 8 feet wide . . ." (section 906);

(c) A rear yard, the depth of which shall be at least 25 feet (irrespective of when the building was erected); (section 908).

11. The Township Commissioners' Committee on Public Works tentatively approved the proposed subdivision plan, subject to the granting of variances by the zoning board.

12. The trustees appealed to the zoning board of adjustment for variances to enable them lawfully to subdivide the properties. On October 15, 1962, the zoning board dismissed the appeal.

13. On November 20, 1962, the Board of Commissioners adopted the recommendation of the Committee on Public Works to reject the subdivision plan.

14. The health, safety, morals and general welfare of the citizenry, and the other purposes of land subdivision ordinances specified in the First Class Township Code of June 24, 1931, P. L. 1206, sec. 3061, added by Act of May 31, 1947, P. L. 362, sec. 1, as amended,

53 PS §58061, will not be affected by the subdivision of ownership of these row houses.

## Discussion

Appellant has brought this matter before us under section 3066 of the First Class Township Code, as amended, 53 PS §58066. This section provides:

"(f) In any case where the board of township commissioners disapproves a subdivision plan, any person aggrieved thereby may . . . appeal to the court of quarter sessions . . . which court shall hear the matter de novo, and after hearing enter a decree affirming, reversing or modifying the action of the board as may appear just in the premises . . ."

The enabling act, section 3061 of the First Class Township Code, as amended, 53 PS §58061, authorizes boards of township commissioners to adopt land subdivision regulations: "For the purpose of assuring sites suitable for building purposes and human habitation and to provide for the harmonious development of townships; for the coordination of existing streets and highways with proposed streets, parks or other features of the township's official plan of streets and highways; for adequate open spaces for traffic, recreation, light and air and for proper distribution of population, thereby creating conditions favorable to the health, safety, morals and general welfare of the citizens . . .": Clinton v. West Norriton Township, 75 Montg. 262 (1958).

The Commissioners of Cheltenham Township on August 19, 1958, enacted ordinance no. 925, known as The Cheltenham Township Subdivision Ordinance of 1958. Section 2 of the ordinance states its purpose in the words of the enabling act. Section 4 of the ordinance provides:

"*No lot in a subdivision may be sold,* no permit to erect, alter, or repair any building on the land of a subdivision may be issued . . . *unless* and until a *sub-*

*division* plan has been approved, and where required, recorded, and until the improvements required by the Board of Township Commissioners in connection therewith have either been constructed or guaranteed by means of a proper completion guarantee in the form of a bond or the deposit of funds or securities in escrow sufficient to cover the cost of the required improvements, as estimated by the Township Engineer, that the improvements will subsequently be installed. Where, owing to special conditions, a literal enforcement of this provision would result in unnecessary hardship, the Board of Township Commissioners may make such reasonable exception thereto, as will not be contrary to the public interest and may permit the sale of a lot, issuance of a permit, or erection of a building, subject to conditions necessary to secure adequate streets and other public improvements."

Section 212 of the subdivision ordinance provides:

". . . The minimum size of lots shall be governed by the requirements of the current Zoning Ordinance of the Township."

The zoning ordinance at section 903, provides that in "F" commercial district, "A lot area of not less than 1,250 square feet per family shall be provided for every building hereafter erected, altered or used in whole or in part as a dwelling." Each lot in question has an area in excess of 1,250 square feet.

The plan introduced in evidence shows that the front yard requirement of section 905 is complied with to all practical intents and purposes. However, the rear yard requirement of section 908 is not complied with, and, of course, the side yard requirement is not complied with as respects the houses on the interior of the row.

Section 1511 of the Cheltenham Township Zoning Ordinance No. 873 provides that:

"1. Any land, the existing lawful use of which at the time of passage of this ordinance does not conform

with the regulations of the district in which it is located, shall have such use considered a non-conforming use, which may continue on such land . . ."

"2. Any lawful building, or the lawful use of any building existing at the time of the passage of this Ordinance that does not conform to the use, height, location, size or bulk with the regulations of the district in which it is located, shall be considered a non-conforming building or use, and may continue such use in its present location . . ."

Thus these row houses, lawfully used as separate residences at the time of passage of the ordinance, may continue to be used as such. Although the yards are not as deep or as wide as specified in sections 905, 906 and 908 of the zoning ordinance, these deviations from the ordinance antedated the same and, accordingly, may be continued. Then, is the subdivision ordinance a bar to the proposed subdivision?

Section 3063 of the First Class Township Code, 53 PS §58063, provides: "Where subdivision regulations have been adopted under the authority of this article, no subdivision of any lot, tract or parcel of land shall be affected; . . . except in strict accordance with the provisions of such regulations."

The commissioners in subdivision ordinance, section 212, clearly set up a standard or rule of reference to the current zoning ordinance, by which to pass upon subdivision applications. The zoning board refused to grant variances which would have given an imprimatur to the preexisting nonconformation with the zoning ordinance. Hence, the commissioners were confronted with an application for approval of a subdivision plan, which did not meet the requirements of the zoning ordinance as construed by the zoning board of adjustment, and they, therefore, disapproved the subdivision plan. Ordinarily we should not interfere with the strict application of standards of a zoning ordinance to sub-

division plans of proposed developments. However, it appears to be grossly unjust, if not an unconstitutional deprivation of property, to apply these standards to a subdivision plan of existing row houses, which were built for separate dwellings many years before the first zoning or subdivision act or ordinance was enacted in Pennsylvania, and which have been so used ever since.

The board of adjustment was of the opinion that the buildings should not be subdivided into separate ownership because they are not separated by fire walls. However, the professionally trained township engineer, who has had nine years' experience in such official capacity, stated categorically that it will make no difference to health, safety, morals and general welfare whether the buildings are commonly owned or separately owned.

Since the evidence before us discloses no just or lawful cause for disapproval of this plan of subdivision of these row houses, the subdivision plan will be approved.

And now, April 4, 1963, the action of the Commissioners of Cheltenham Township is reversed, and the subdivision plan is approved. The action of the court is approving such plan and an approved duplicate copy of such plan, shall within 30 days of this date, be recorded by appellant in the office of the recorder of deeds of this county, and the recording information shall be shown on the plan. At least two copies on linen and four copies on paper shall be submitted to the township engineer's office for departmental use.